IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,


V.

                                                    CASE NO.  18-CR-404 (TJM)


CAMMRON ROBINSON,

                        Defendant.
_____



# <u>SENTENCING MEMORANDUM</u>



DATED:        April 9, 2019                    LISA A. PEEBLES
                                               Federal Public Defender


                            By:


                                    Federal Public Defender
                                    Bar Roll No. 507041
                                    Clinton Exchange, 3rd Floor
                                    4 Clinton Street
                                    Syracuse, New York   13202
                                    (315) 701-0080

## INTRODUCTION

Cammron Robinson's case is rife with extraordinary mitigating factors that should be considered when fashioning an appropriate sentence. Cammron Robinson's problems began in utero. His mother abused drugs and alcohol while she was pregnant with him. As a baby, he was under the care of the Department of Children, Youth and Family services (DCYF) because he was exposed to domestic violence, drug abuse and neglect. As early as 3 years old, Cammron underwent psychological testing. By then, doctors discovered that he had elevated lead levels. (*See* Psychological Evaluation dated March 31, 1998). The report noted he had already suffered numerous injuries, including a broken arm and lacerations from "falls." *Id.* During the testing, he had tremors in both hands when he was working on the fine motor tasks. A speech impediment was detected and during a speech and language evaluation the evaluator noted poor saliva management. ( *See* Speech and Language Evaluation Diagnostic summary dated March 3, 1998). To compound his childhood traumatization, Cammron's older brother sexually abused him when Cammron was only 4-years old. The sexual abuse by his brother involved more than merely touching Cammron in a sexual way. It was a violent effort at anal penetration. Cammron was finally permanently removed from his mother. He spent the next six years in institutional care. Cammron was diagnosed with Attention Deficit Hyperactivity Disorder, Post Traumatic Stress Disorder, and Reactive Attachment Disorder. *Id.* Cammron spent his childhood living in group homes and foster care. He was evaluated and tested again and again. At age 6, his full scale IQ was determined to be 83. (*See* attached Bradley School Psychological Evaluation dated January 29, 2003 and Re-Evaluation dated March 22, 2005) He was described by the examiner as a "somewhat disheveled 6 year old Caucasian boy of average height and weight and badly bitten fingernails." Id. His cognitive functioning appeared to be in the low average range. The examiner

2

determined that Cammron would likely learn at a slower rate than his same-aged peers. *Id.* When Cammron was seven he underwent an assessment to determine if he suffered from Dissociative Identity Disorder. (*See* Psychological Centers, Inc. report dated August 10, 2003) Paragraph 99 of the PSR refers to an alternate identity of "Cammprint." The clinical assessment concluded Cammprint and Cammron were not different identities. *Id.* The examiner, Lori Myren-Manbeck, PhD. Licensed Clinical Psychologist, found Cammron was playing a role. Dr. Myren-Manbeck did not believe Cammron met the criteria for Dissociative Identity Disorder. *Id.* She concluded the abuse Cammron suffered has had a major impact on his development and mental health. *Id.*

Cammron's last stop through his institutional journey was St. Mary's Home for Children in Rhode Island. Cammron was finally rescued when he was 11years old by Stuart Robinson, his adoptive father. Mr. Robinson saw Cammron's story on a television adopt-a-child series.(*See* attached video interview of Mr. Robinson's interview) Mr. Robinson is the athletic director for SUNY New Paltz and was captivated by Cammron's story. He believed Cammron deserved a loving home. He believed Cammron deserved a chance. Mr. Robinson described Cammron as a lab rat for medications. *Id.* According to Mr. Robinson, Cammron developed Tourette's Syndrome as a side effect from one of his prescribed medications. Cammron required extensive counseling and medications when he transitioned to a single-parent home from a high-end residential facility. He was placed in special education at Highland Middle and Elementary Schools. Cammron performed well and earned several rewards. (*See* attached Ulster BOCES school records dated November 13, 2006) During his video interview, Mr. Robinson described Cammron's struggles throughout the past ten years but he witnessed significant improvements. He describes Cammron as thoughtful and kind. *Id.*  Mr. Robinson remains supportive of Cammron and maintains he will not abandon him. *Id.* Cammron has an overwhelming

documented history of years of childhood neglect, physical abuse, mental abuse, and sexual abuse. His stunted social development due to his early childhood abuse and placement in institutional care presents compelling reasons for a non-Guideline sentence.

## PRELMINARY STATEMENT

On December 13, 2018, pursuant to a written plea agreement, Cammron Robinson, pled guilty to a four-count information. All four counts charged him with Sexual Exploitation of a Child and Willfully Causing an Act to be Done, in violation of 18 U.S.C. Sections 2251(a),(e) and 18 U.S.C. section 2(b). The four counts involve four boys ranging in age from 11 to 13.  It is undisputed that Cammron never met nor touched, any of the boys whose images he received. It is also undisputed that Cammron never distributed those images to others.

Cammron is scheduled to be sentenced on May 9, 2019, before Judge McAvoy in Albany, New York.  A Presentence Investigation Report ("PSR") was prepared by the United States Probation Department on March 26, 2019, in anticipation of sentencing.  According to the PSR, the total offense level is 43 and Cammron's Criminal History Category is I, resulting in a guideline imprisonment range of life.  The statutory maximum penalty is 30 years. The defense has raised minor objections to the factual contents contained in the PSR with probation before filing this memorandum.

This memorandum is submitted in support of a non-Guidelines sentence of fifteen years imprisonment, and ten years of supervised release. Such a sentence is appropriate in this case because (1) the factors listed in 18 U.S.C. § 3553(a) all weigh in favor of a reasonable term of incarceration; (2) a Guideline sentence would be unreasonable and would not satisfy the statutory purposes of punishment; (3) Guideline sentence in this case would constitute cruel and unusual punishment in violation of the Eighth Amendment. As discussed further below, a

Guidelines sentence would severely over-punish Cammron,-a 22-year-old young man who himself was the victim of physical and sexual abuse and suffers from a host of psychological trauma as a result-for a crime that, while serious, is not outside the norm of modern teenage behavior.

## OBJECTIONS TO THE PSR

The defense has three factual objections to the PSR. Paragraph 90 suggests Cammron made comments indicative of him wanting to hide a pen in jail for purposes of using it as a weapon. Defense counsel was present for the interview and this insinuation misrepresents what Cammron said. He has always wanted a normal size writing instrument to use since he has been in custody. He frequently asks for a normal pen to write letters. He explained that he was told he could not have a regular pen because it can be used as a weapon. The PSR implies Cammron sought to hide a pen in his shoe to use as a weapon. This mischaracterizes what he said and should be corrected.

The defense also objects to paragraph 89, specifically footnote 7. Cammron admitted his conduct in this case and there were no other "sexual behaviors with minor males" to discuss. The question asked about his past relationships. He was asked whether he ever married and who he dated. Cammron explained he was involved in heterosexual relationships in the past, but that considering his conduct in this case it may call into question his sexuality. Footnote 7 should be stricken from the report.

Finally, the defense objects to footnote 5 referenced in paragraph 18. The law enforcement agents scoured Cammron's electronic devices and discovered four victims of sexual exploitation. He was arrested on October 4, 2017, and pled guilty on December 18, 2018, more than a year after the execution of the search warrant. Footnote 5 suggests there were a number of males

whom Robinson "may have communicated and/or sexually exploited, but the probation officer has only been provided with information regarding the victims outlined in this report." This statement is pure speculation and not grounded in fact.  If there were any additional victims, evidence would have been discovered, and Cammron would have been required to plead guilty to additional counts. This footnote should be stricken from the report.

## ARGUMENT

The defense urges the Court to impose a below-Guidelines sentence in this case for two reasons. First, the Guidelines range applied to Cammron's case is overly severe and incompatible with §3553(a) factors. In Cammron's case, the guideline provides a sentencing range that is grossly disproportionate to the gravity of Cammron's offense and fails to account for his youth, background and disabilities.  There is no question a sentence of thirty years or more would constitute cruel and unusual punishment in light of Cammron's personal circumstances and the gravity of the offense.

### A.  A Non-Guideline Sentence Is Sufficient But Not Greater than Necessary.

1.  <u>This Court has the Discretion to Sentence Cammron to fifteen years.</u>

The United States Sentencing Commission Guidelines serve as "the starting point and the initial benchmark" for all sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 46, 49 (2007). However, following the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220 (2005), the Guidelines are only advisory.  They are not mandatory. In determining a sentence, a Court must not only consider the Guidelines calculations, but also equally take into account all other statutory concerns listed in 18 U.S.C. § 3553 (a)(2)  as well as the defendant's unique circumstances.  *See* 18 U.S.C. § 3553 (a). A district court should not presume a Guidelines sentence will always satisfy § 3553(a), because the Guidelines are only "a rough

approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 351, (2007); *Booker*, 543 U.S. at 245. A court is free to reject a Guidelines sentence when "the Guidelines sentence itself fails properly to reflect §3553(a) considerations." *Rita*, 551 U.S. at 350–51. A sentencing judge also "may vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Here, as discussed below, both of these concerns apply: the Guidelines range fails to properly reflect the §3553(a) factors and policy issues compel a shorter sentence than suggested by the Guidelines.

2.   The Guidelines Range Fails to Properly Reflect the § 3553(a) Factors

18 U.S.C. § 3553(a) includes a list of factors a court is to consider when determining the appropriate sentence ("the § 3553(a) factors"). The court must consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed— (A) to reflect the seriousness of the offense, to promote respect for the law; and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Here, each of these factors militate towards a non-guideline sentence.

a.   *Nature and Circumstances of the Offense and Characteristics of Cammron Robinson*

The first factor that the Court must consider is the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Cammron pleaded guilty and accepts responsibility for very serious crimes, but his behavior is not such an aberration that it merits a prison sentence of thirty years to life, as the Guidelines recommend.

7

"Sexting" is an unfortunate cultural phenomenon in which teenagers and adolescents participate with alarming frequency. Depending on the study, somewhere between 4% and 20% of teenagers report that they have sent sexually suggestive text messages to another teen. According to a 2008 report by The National Campaign to Prevent Teen and Unplanned Pregnancy (NCPTUP), 20% of teenagers ages 13-19 have "electronically sent, or posted online, nude or semi-nude pictures or video of themselves." Nat'l Campaign to Prevent Teen and Unplanned Pregnancy, Sex and Tech: Results from a Survey of Teens and Young Adults 1 (2008), http:// www.thenationalcampaign.org/sextech/PDF/SexTech_Summary.pdf; see infra Part I (discussing some of the limitations in the methodology underlying this poll). A narrower 2009 survey by the Pew Internet & American Life Project focused exclusively on cell phone transmission of images, finding that 4% of teenagers ages 12-17 who own cell phones "report sending a sexually suggestive nude or nearly nude photo or video of themselves to someone else." Amanda Lenhart, Pew Internet & American Life Project, Teens and Sexting: How and Why Minor Teens Are Sending Sexually Suggestive Nude or Nearly Nude Images Via Text Messaging 4 (2009), http://www.pewinternet.org/~/media//Files/Reports/2009/PIP_Teens_and_Sexting.pdf.  While the engagement in this activity between minors and adults should be discouraged and punished by the force of law, the harshness of that punishment should be appropriately tailored to comply with the 3553 factors.

By the mid-teens, the human brain's reward centers linked to emotional and sexual arousal are well-developed. However, the prefrontal cortex, which connects reasoning with emotion and enables people to weigh consequences, is not fully formed until the mid-twenties.[1] The confluence of a developed reward center and underdeveloped impulse control make risky

---

[1]     Dennis, E.L & Thompson, P.M. Typical and Atypical Brain development: A Review of Neuroimaging studies (2013);  Stiles, J. & Jennigan, T.L. The Basis of Brian development."

behavior an issue for all adolescents. This is why when it comes to exchanging sexual images of themselves, an Associated Press poll found that one-third of teenagers sexted even though more than 70% recognized that doing so may have serious consequences[2]. The availability of digital messaging applications enables adolescents to act on their impulsivity and curiosity while diminishing their inhibitions under the guise of anonymity. *Psychology of the Digital Age: Humans Become Electric* by John Suler.

Cammron's personal history and age made him particularly susceptible to digital disinhibition. While twenty-two-year-olds have underdeveloped prefrontal cortices, his personal characteristics make him remarkably socially and emotionally immature. Cammron could explore his interest in a detached forum in which his actions appeared to him as harmless because he never physically touched the boys he was in communication with. This digital disinhibition also affected the minors Cammron communicated with, and enabled them to take and share sexually suggestive pictures and videos of themselves. Cammron now recognizes that this conduct was not only unlawful, but wrong. However, the gravity of this offense coupled with Cammron's unique characteristics justify a non-Guidelines sentence.

     b. *Need for the Punishment to Reflect the Seriousness of the Offense and Promote Respect for the Law*

Section 3553(a)(2)(A) instructs the Court to craft a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. A number of factors determine whether a particular sentence just. A punishment is 'just' insofar as it 'fit[s] the crime,' and 'reflect[s] the gravity of the defendant's conduct.' *Simon v. United States*, 361 F.

---

[2]     One-third have sent or received "sext" messages on their phones or online, with 71 percent describing sexting as a serious problem. Only 15 percent of the 14-24 year olds polled said they have shared naked photos or videos of themselves. http://www.wired.com/2009/12/sexting-survey/

Supp. 2d 35, 43 (E.D.N.Y. 2005). (quoting S. Rep. 98-225, 1984 U.S.C.C.A.N. 3182, 3258-59).

Senate Report 98-225 explained that the 3553 factors are:

> another way of saying that the sentence should reflect the gravity of the defendant's conduct. ***From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense,*** and the public interest in preventing a recurrence of the offense. From the defendant's standpoint the sentence should not be unreasonably harsh under all the circumstances of the case and should not differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances.

In this case, the photo and video images of the boys were never distributed. Therefore, the harm to the victims has been contained. The production guidelines seek to harshly punish offenders who produce images for distribution and feed the market for downloaders of child pornography. Cammron's conduct involved on-line gaming chats with boys between the ages of 11 and 13 during which he asked for video footage of them masturbating. He properly identified himself to the victims. He told them his full name, where he lived, the name of his dog and identifying information about other family members. He even asked V-1 if he could talk to his mother about possibly meeting him. Cammron's behavior was indicative of an emotionally immature young man. Although twenty-two years old, Cammron's emotional development was that of a teenager. It's clear from his conduct that he was able to relate socially with teenagers because he never attempted to mask his identity. Cammron forged relationships with the boys he met through gaming sights but he never intended to share any images he received from them. Unlike older mature adults who produce images of child pornography, the images Cammron solicited were never disseminated over the internet. In this case, the victims will not be subjected to future harm by others sharing or viewing their photos or videos. Cammron never sought to capitalize on their vulnerabilities for purposes of sharing images with others.

### c.   A Below Guidelines Sentence in this Case Will Fulfill the Need for Deterrence

The court is obligated to impose a sentence that "afford[s] adequate deterrence to criminal conduct." § 3553(a)(2)(B). A sentence of thirty years to life is a more severe sentence than most murderers receive in state court. Fifteen years is a harsh sentence, which would certainly provide more than an adequate deterrent for young people who might engage in this type of conduct. It is more than enough of a deterrent for Cammron. Upon release from imprisonment, he will have to comply with strict requirements of supervised release, along with becoming a registered sex offender in any community he lives in.  He will not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his probation officer or, perhaps, even the Court. Cammron will be labeled a sex offender and will bear that scarlet letter for a majority of his life. These collateral consequences of conviction, along with a fifteen-year prison sentence, are more than sufficient to deter a young man like Cammron from ever engaging in this type of conduct in the future.

### d.   Cammron's Remorse and Low Risk of Recidivism

The Court must next consider the need to protect the public from further crimes by Cammron. 18 U.S.C. § 3553(a)(2)(C). The U.S. Sentencing Commission has expressed that "the likelihood of recidivism and future criminal behavior must be considered" to protect the public. U.S. SENTENCING GUIDELINES MANUAL, Chapter Four, Introductory Commentary.  The Commission has found that offenders without prior arrests have the lowest recidivism rate of all other offenders.  *See* U.S. Sentencing Commission, *Recidivism and the "First Offender"* 13-14 (May 2004) [hereinafter "Recidivism Report"].[3]  Courts have similarly reasoned that

---

[3]      Recidivism rate for defendants with no prior arrests is 6.8%.  *See Recidivism and the "First Offender,"* 14 *available at* <http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

incarceration would have a greater significance for a defendant with no incarceration history. *See United States v. Baker*, 445 F.3d 987 (7th Cir. 2006). In *Baker*, the Seventh Circuit affirmed a below guideline sentence for a possessor of child pornography where the lower court took into account the defendant's "lack of criminal history, [and] his relative young age."[4] *Baker* at 992. Cammron has no criminal history. As per the Sentencing Commission, these conditions give him the lowest rate of potential recidivism. *See Recidivism Report*, at 14.

Cammron has expressed acceptance of responsibility for his actions and manifested a sincere recognition for the seriousness of his offense. He immediately cooperated with law enforcement during the execution of the search warrant of his home. Cammron admitted his conduct and identified the files he stored on his computer containing the images of the victims he requested. In addition to the victims, he deeply regrets hurting his adoptive father, the one person who provided the love and support he so desired during his childhood. Cammron seeks to redeem himself with the hope of repairing the damage and harm he caused.

>    e. *Cammron's Extreme Vulnerability Makes Prison Atypically Punitive for Him and Would not Provide Treatment in the Most Effective Way*

The next factor the Court must consider is the need for the sentence imposed to provide the defendant with correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(D). A defendant's physical and emotional fragility, which makes him or her far more likely than the typical offender to suffer sexual violence in prison, may also be considered in determining whether crafting alternatives to incarceration is appropriate. *United States v. K*, 160 F. Supp. 2d 421, 443 (E.D.N.Y. 2001).

---

publications/2004/200405_Recidivism_First_Offender.pdf>. However, the re-conviction recidivism rate for these offenders is 2.5%. *Id*. Re-conviction recidivism rates "limit[] recidivism to the first reconviction during the two year follow-up period." *Id*. at 13.

[4]    Additionally, the Court noted as significant, "the District Court's finding that a prison term would mean more to [the defendant] than to a defendant who had been previously been imprisoned." *Baker*, at 992.

Sociological studies show that victims of physical and, in particular, sexual assault, in male prisons "tend to be [ ]small, young, and middle class . . . lack mental toughness and are not 'street-wise' . . . appear to be less involved in a criminal culture before incarceration and to have less institutional experience" *See* Kevin N. Wright, *The Violent and Victimized in Male Prison,* 16 J. of Offender Rehabilitation 1, 6, 22 (1991).  Studies of rape in federal prisons reveal that "the target is singled out by assailants quickly as one who (1) is generally weak and exploitable and (2) 'appropriately' feminine. Rape in prison occurs brutally and inevitably . . . [o]ften, the younger, smaller, or less streetwise inmates are the victims. *Rape in Prison and AIDS: A Challenge for the Eighth Amendment Framework of Wilson v. Seiter,* 44 Stan. L.Rev. 1541, 1545 (1992).  Estimates of the number of rapes occurring in prisons, countrywide, run as high as 7,000 per day, a figure said to be conservative . . . . Gang rape is common." Martin L. Haines, "Prison Rape Highlights the Need for Better Prison Administration," 154 N.J.L.J., Dec. 14, 1998, at 23.

In light of the alarming realities of prison life, courts have recognized mental and physical conditions as relevant in determining whether a downward departure is warranted, if they are present to an unusual degree.  *See* U.S. SENTENCING GUIDELINES MANUAL §§5H1.3-1.4. In extraordinary cases, a Court "may downwardly depart when a number of factors […] combine to create a situation that 'differs significantly from the 'heartland' cases covered by the guidelines.'"  *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (quoting U.S.S.G. §5K2.0 cmt.).  *See also United States v. Taylor*, 2008 WL 2332314 (S.D.N.Y. June 2, 2008) (rejecting a guideline 151-188 months sentence imposing the mandatory minimum for a first-time child pornography offender with a history of depression, whom doctors found to present no risk to minors); *United States v. Jimenez*, 212 F. Supp. 2d 214 (S.D.N.Y. 2002) (granting a downward departure where the defendant suffered from a brain aneurism, psychosis, and memory loss).

13

Likewise, Courts expressed that "extreme vulnerability of a criminal defendant is a proper ground for departure" and granted downward departures where these circumstances are present. *United States v. Gonzalez*, 945 F.2d 525, 526 (2d Cir. 1991) (affirming a downward departure sentence where the defendant had particular features that would make him prey to criminals he would associate in prison) (quoting *U.S.  v. Lara*, 905 F.2d 599, 603 (2d Cir. 1990)).

Like the defendants in *Taylor* and *Jimenez*, Cammron has a combination of factors that warrant consideration in this case.   Physically, he is slender and tall. He lacks mental toughness. He suffers from Tourette's Syndrome causing him to convulse with involuntary back, arm and hip movements.  Cammron has a speech impediment, ADHD and is emotionally immature. He is naive, and is extremely vulnerable to victimization and abuse in prison.  Prison will be an incredibly harsh and unforgiving place for someone like Cammron. He is generally mentally weak and exploitable. Therefore, a long term of imprisonment would not provide correctional treatment effectively. Accordingly, this sentencing factor also weighs against imposing a Guidelines sentence.

### B. Cammron's Youth Combined with His Immaturity and  ADHD Features Distinguish Him from Offenders for Whom a Fifteen-Year Sentence Would be Appropriate.

The United States Supreme Court recognizes the common sense notion that "the qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Roper v. Simmons*, 543 U.S. 551, 574 (2005). *Roper* recognized that adolescents have diminished culpability due to their lack of maturity and therefore are less deserving of severe punishments. *Id*. "[A]s compared to adults, juveniles have a lack of maturity and an underdeveloped sense of responsibility . . . they are more vulnerable or susceptible to outside pressures, including peer

pressure . . . and their characters are not well formed." *Graham v. Florida, 560 U.S. 48, 69 (2010)*(citing *Roper,* 543 U.S. at 569–70).

Psychology and brain imaging studies demonstrate fundamental differences between adolescent and adult minds. Critical "parts of the brain involved in behavior control continue to mature through late adolescence." *Graham*, 130 S.Ct. at 2026 (citing *Brief for The American Medical Association, et al. as Amici Curiae Supporting Neither Party 16–24 (No. 08–7412), 2009 WL 2247127 at \*16–24* (hereinafter *Graham AMA Brief*); *Brief for The American Psychological Association et al. as Amici Curiae Supporting Petitioners at 22–27 (No. 08–7412), 2009 WL 2236778 at \*22–28* (hereinafter *Graham APA Brief*)).

"Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults." *Graham, 560 U.S. 48 at 69*  (quoting *Roper,* 543 U.S. at 570). "From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Roper,* 543 U.S. at 570.

"Drawing the line at 18 years of age is subject ... to the objections ... against categorical rules." *Id.* at 574. "The qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Id.* While 18 may be the "point where society draws the line for many purposes between childhood and adulthood," scientific developments conclude that full adulthood is not biologically achieved until much later in life than age 18. *Id.* The American Psychological Association explains that differences between adolescents and adults with respect to "risk-taking, planning, inhibiting impulses, and generating alternatives" is connected to "adolescent behavioral immaturity: the human brain does not settle into its mature, adult form until after the adolescent years have passed and a person has entered young adulthood." Brief for

the American Psychological Association and the Missouri Psychological Association as Amici

Curiae Supporting Respondent at 9, *Roper v. Simmons,* 543 U.S. 551 (2005) (No. 03–633), 2004

WL 1636447 at *9 .

Scientific studies on adolescent behavior conclude that adolescents are less able than

adults to voluntarily control their behavior. "Relative to individuals at other ages, ... adolescents

... exhibit a disproportionate amount of reckless behavior, sensation-seeking and risk taking."

Linda Patia Spear, *The Adolescent Brain and Age–Related Behavioral Manifestations,* 24

Neuroscience & Biobehavioral Reviews 417, 421 (2000). Sensation seeking is a normal part of

adolescent development, so much so that "it is statistically aberrant to refrain from such [risk-

taking] behavior during adolescence." *Id.* at 421.

"The brain's frontal lobes are still structurally immature well into late adolescence."

*Graham* AMA Brief at 18 (citing Nitin Gogtay, et al., *Dynamic Mapping of Human Cortical*

*Development During Childhood through Early Adulthood,* 101 Proc. of the Nat'l Acad. of Sci.

8174 (2004) (studying subjects aged 4–21)). "[O]ne of the last brain regions to mature" is the

prefrontal cortex, the area of the brain responsible for a variety of cognitive and executive

functions. *See* B.J. Casey et al., *Structural and Functional Brain Development and its Relation to*

*Cognitive Development,* 54 Biological Psychol. 241, 243 (2000). ("Imaging studies show that the

brain is still maturing well into the mid–20s, especially in regions responsible for regulating

emotions, controlling impulses, and balancing risk and reward." Steinberg, *You and Your*

*Adolescent: The Essential Guide for Ages 10–25,* 116 (Rev. ed. 2011).

Recognized research demonstrates that adolescents as a group are less capable of

controlling their impulses and regulating their behavior. As a result they are less capable of

making rational and informed decisions in their own interest than are adults. This distinction is

critical in in considering whether a fifteen-year mandatory minimum sentence is unconstitutionally excessive for a "remarkably socially and emotionally immature" young man.

Cammron's conduct here was not the sort of irreparable evil that should warrant a long minimum prison term. He is a socially repressed 22-year old, confused about his developing sexuality. His brain is still developing, he is still maturing. Courts have recognized these developmental factors in cases involving teenagers and child pornography. Interest in lewd images of minors by one who is emotionally a minor himself does not manifest the same kind of sexual perversion as would a mature adult's focus on the same pictures. In *United States v. Stern,* 590 F.Supp.2d 945, 953 (N.D.Ohio 2008) the district court emphasized the peer-level nature of the sexual interest when imposing a sentence far below the Guidelines range for a college student who had begun viewing child pornography at age fourteen. In addition to citing the scientific literature on "the unformed nature of the adolescent brain," *id.* at 953 n. 6, it recognized that "the 14–year–old is acting on normal impulses in an unacceptable manner (and may well be unaware of the impact of his crime), whereas the forty-year-old is acting on deviant impulses and is expected to understand the terror that this crime inflicts upon its victims." *Id. See also United States v. Polito,* 215 Fed.Appx. 354 (5th Cir.2007) (affirming a downward departure to probation, including one year on house arrest based in part on the fact that the defendant was only eighteen and immature when he committed the offense); *United States v. Strayer,* No. 8–CR–482, 2010 WL 2560466 (D.Neb. June 24, 2010) (granting a below Guidelines sentence for a twenty-five-year-old whose psychological evaluation concluded that he was emotionally close to an adolescent and also had other mental health problems); *United States v. Larson,* 558 F.Supp.2d 1103 (D.Mon.2008) (five-year mandatory minimum sentence for receipt of child pornography was unconstitutional as applied to a mentally retarded twenty-one-year-old),

*vacated,* 346 Fed.Appx. 166, 168 (9th Cir.2009): Amy F. Kimpel, *Using Laws Designed to Protect as a Weapon: Prosecuting Minors Under Child Pornography Laws,* 34 N.Y.U. Rev. L. & Soc. Change 299, 320 (2010) ("Arguably, there is a qualitative difference when a sexually provocative image of a child is viewed by an adult than when such an image is viewed by another child. Adolescents have a certain curiosity about the sexual activity of their peers. This curiosity is distinguishable from the inclination of a pedophile. Even prosecutors have noted that teen viewers might not have the same motives or present the same dangers as adults seeking child pornography.") (citations omitted).

In this case, even a fifteen-year sentence serves no legitimate penological goal. "A sentence lacking any legitimate penological justification is by its nature disproportionate to the offense" and therefore, unconstitutional under the Eighth Amendment. *Graham*, 560 U.S. 48 at 59. Neither "retribution," "deterrence," nor "rehabilitation," justify a fifteen-year mandated prison sentence for Cammron Robinson.

One the one hand, treatment and supervision within the community are necessary for Cammron to mature into the responsible, productive, law-abiding individual, he undoubtedly will become. A sentence of fifteen years in prison for a young man with an underdeveloped brain as remarkably immature as Cammron constitutes cruel and unusual punishment.

### C. Technological Advances Distinguish Cammron's Culpability from Other Offenders for whom a Fifteen-Year Mandatory Minimum is Appropriate.

Fortunately, Congress has enacted laws to protect children from abuse and exploitation by punishing the production, trafficking, and receipt of child pornography. However, these laws do not appropriately reflect the impact technology has had on the profile and culpability of a child

pornography recipient. In this case, the law punishes Cammron—who at the time was 22 years old and never left his bedroom during his offense—far too harshly.

No sentence—mandatory, or otherwise—is *per se* constitutional. *Solem v. Helm*, 463 U.S. 277, 290 (1983). For more than a century, the Supreme Court has reiterated that the baseline for justice is the notion that the "punishment for crime be graduated and proportioned to [the] offense." *Weems v. United States*, 217 U.S. 349, 356 (1910). Where a punishment is deemed disproportionate to the offense committed, it amounts to cruel and usual punishment. *United States v. Santos*, 64 F.3d 41, 46 (2nd Cir. 1995), rev'd on other grounds, 516 U.S. 1014 (1996). Moreover, no punishment standing alone is to be considered constitutional without a reference to additional facts. *Solem*, 463 U.S. 277 at 290. The unique additional facts of this case distinguish Cammron's culpability from other defendants for whom a fifteen-year sentence may be constitutional and appropriate.

Prior to the advent of the internet, "production and duplication of [child pornography] required expensive equipment of the kind not normally found in the average home. To distribute images of child abuse, one had to either personally transport them or rely on a domestic mail carrier. Unsurprisingly, these challenges and risks may have served as barriers to offending for some persons who would have otherwise been inclined to obtain [child pornography]" Erik Faust, *et al., Child Pornography Possessors and Child Contact Sex Offenders: A Multilevel Comparison of Demographic Characteristics and Rates of Recidivism. The Sentencing Commission itself has acknowledged the impact of technology:*

> These technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre that previously was not as widely circulated as it is today. As a result of such changes, entry-level offenders now easily can acquire and distribute large quantities of child pornography at little or no financial cost and often in an anonymous, indiscriminate manner.

U.S. Sentencing Comm'n, *Federal Child Pornography Offenses* (Dec.2012), at 312–13

Cammron committed a crime when he communicated with underage boys while playing on-line video games. He requested video images of the boys masturbating and he in turn sent images of himself masturbating. He readily identified himself and sought to strike up friendships with the boys he was communicating with on line. He never chatted with adults about underage boys, nor did he ever seek to exchange images with anyone. Cammron has already paid dearly for his crimes and will continue to pay for the rest of his life. Fifteen years in prison might as well be a lifetime for this young man. It will destroy him. Some offenders need to be removed from society; Cammron is not one of them. A law that would punish a young man like Cammron so severely—for a first-time offense he committed behind a computer screen—is cruel and unusual. Simply, the fifteen-year mandatory minimum sentence is an extreme sentence that is grossly disproportionate to the crime. This court has the authority to hold that the mandatory minimum sentence of fifteen years is unconstitutional in this case.

### D.  The Gravity of Cammron's Particular Conduct Distinguishes him from Offenders Whose Conduct Merits a Fifteen-Year Mandatory Minimum Sentence

In determining whether a sentence is unconstitutional as applied to a particular defendant, a court must compare the gravity of the offense and the harshness of the penalty; to do so a court should review a number of factors, including: culpability of the defendant, crimes of conviction, criminal history, the harm or threat to the victim(s), the magnitude of the crime, the defendant's age, and the true length of imprisonment.  *See Solem*, 463 U.S. at 288; *Ewing v. California*, 538 U.S. 11, 29 (2003); *Rummel v. Estelle*, 445 U.S. 263, 275 (1980).  Taken together, a review of these factors in the present case creates a strong inference that the punishment Cammron faces is disproportionate to the crime he committed.

There is no denying that his offense is very serious.  However, it should be noted that Cammron's role in the child pornography marketplace was minuscule.  He never paid for any child pornography or shared any child pornography.  Cammron himself fell victim to sweeping societal shifts that led to dangerous consequences when combined with adolescent sexuality.

As discussed above, sexting is increasingly a part of popular culture. Studies have found that twenty percent of teenagers sent or posted nude or semi-nude images of themselves. Stephanie Gaylord Forbes, *Sex, Cells, and Sorna: Applying Sex Offender Registration Laws to Sexting Cases,* 52 William & Mary L.Rev. 1717 (2010). "Four percent of teens ages 12 to 17 who own cellphones have sent nude or nearly nude images or videos of themselves, while fifteen percent in that group have received such images of someone they know." Wendy N. Davis, *'Sext' Education,* ABA Journal, May, 2011 at 20–21 (citing The Pew Research Center's Internet & American Life Project).

The fact that so many other adolescent boys and girls are doing what Cammron did does not by any means excuse his conduct. It does, however, suggest that the gravity of the offense is disproportionate to a fifteen-year mandatory minimum prison sentence. If the federal criminal justice system is intent on prosecuting so severely the type of crime Cammron committed, then the United States will need to build more prisons. Cammron's offense was a non-contact offense. This fact should lessen the absolute magnitude of the crime.  His crime should not be generalized with crimes that are often connected with contact offenses.  Therefore, this information considered, in combination with Cammron's youth, susceptibility to disinhibition, and the brutality he faces in prison demonstrate that even a fifteen-year sentence for Cammron Robinson is not proportionate to his crime. A comparison of Cammron's conduct and potential punishment also reveals gross disproportionality.

## CONCLUSION

For the reasons discussed above, the defense requests that the Court impose a non-Guidelines sentence to reflect the nature of the offense conduct and satisfy the statutory purposes of punishment.

DATED:        April 9, 2019                        LISA A. PEEBLES
                                                    Federal Public Defender


                                        By:    *S/Lisa A. Peebles, Esq.*
                                                Federal Public Defender
                                                Bar Roll No. 507041
                                                Clinton Exchange, 3rd Floor
                                                4 Clinton Street
                                                Syracuse, New York   13202
                                                (315) 701-0080


cc:    Geoff Brown, Esq., AUSA
        Angela Bennett-Rodriguez USPO
        Cammron Robinson